# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MONTANA
# BUTTE DIVISION

| | |
|---|---|
| RHONDA STATON,<br><br>　　　　　　　Plaintiff,<br><br>vs.<br><br>CITY & COUNTY OF BUTTE-SILVER BOW and DOES 1-10,<br><br>　　　　　　　Defendants. | **CV-20-60-BU-BMM**<br><br><br>**ORDER** |

## INTRODUCTION

Defendant City and County of Butte-Silver Bow ("BSB") has filed a motion for summary judgment. (Doc. 79.) Plaintiff Rhonda Staton ("Staton") opposes the motion. (Doc. 110.)  BSB replied (Doc. 133), and the Court held a hearing on June 30, 2023. (Doc. 137.)

## BACKGROUND

Staton worked for the Butte-Silver Bow Law Enforcement Department ("LED") from December 10, 2001, until August 24, 2020. (Doc. 116, ¶ 1.)  Staton worked in the patrol division for approximately seven years before being assigned to the detective division on July 7, 2008. (*Id.*, ¶ 3.) Staton has brought the following claims against BSB relating to her employment and termination therefrom: (1) discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII")

1

and the Montana Human Rights Act ("MHRA"); (2) hostile work environment and harassment in violation of Title VII and the MHRA; (3) retaliation in violation of Title VII and the MHRA; (4) disability discrimination in violation of the Americans with Disabilities Act ("ADA") and the MHRA; (5) violation of the Family and Medical Leave Act ("FMLA"); (6) infliction of emotional distress ("IED"); and (7) punitive damages. (Doc. 7 at 17–28.) The Court granted summary judgment to BSB on Staton's FMLA claim. (Doc. 63 at 7.)

Staton alleges that she experienced years of workplace harassment and discrimination, primarily based on her gender, but also relating to disability. Staton alleges that she experienced less favorable treatment than her male counterparts. (Doc. 7, ¶ 25.) Staton also contends that BSB agents subjected Staton to verbal harassment, used "offensive items" to target her gender, admonished Staton, but not similarly situated male employees, for participating in BSB related social functions, and made a false complaint regarding her work on a case. (*Id.*, ¶ 27.)

Staton alleges that LED officers drew penises on her car, placed tampons in her home and work mailboxes, pointed a laser at her chest, told her where she "ranked" on the SWAT's "Fuckable List," and placed a calendar with a topless male coworker with a gun superimposed near the groin area by her office door. (Doc. 116, ¶¶ 51–56.) Staton alleges other disparate treatment including that LED forbade Staton from having other women in her office with the door closed and prohibited

2

women from riding in the same patrol car. (*Id.*, ¶¶ 63–64.) Staton also claims that LED required her to check in and check out and to inform dispatch of her location even when she was off duty when male employees were not required to do so, refused to assign her "callouts" at the same frequency as men, and subjected her conduct to heightened scrutiny than that of her male counterparts. (*Id.*, ¶¶ 78–81.)

Staton submitted complaints about the alleged harassment and hostile work environment to BSB's Human Resources ("HR") department, starting in 2018. (Doc. 16, ¶ 29.) Staton claims that she began experiencing retaliation when her supervisors and co-workers learned of the complaints. (Doc. 116, ¶¶ 84–86, 89–91.) BSB hired a third-party consultant, Michelle Edmunds ("Edmunds"), to investigate Staton's complaints. (Doc. 116, ¶ 27.) Edmunds determined that the workplace behaviors proved upsetting and uncomfortable, but did not rise to the level of "harassment" as defined by the Equal Employment Opportunity Commission ("EEOC") (*Id.*, ¶ 28.) Staton submitted a complaint in January 2020 regarding Edmunds's investigation and requested paperwork for FMLA leave (*Id.*, ¶ 34.)

Sheriff Ed Lester ("Sheriff Lester") met with Staton in February 2020 and ordered her to go on paid administrative leave. (Doc. 82-7.) Sheriff Lester required Staton to submit to a psychological Fitness for Duty Evaluation ("FFDE") with Dr. George Watson ("Dr. Watson"), a psychologist hired by LED. (Doc. 116 at 43–44.) Dr. Watson concluded in his April 27, 2020 report that Staton was not fit for duty.

3

(Doc. 82-8 at 8.) Sheriff Lester sent Staton a due process letter on July 27, 2020, notifying her of Sheriff Lester's intent to terminate her employment. (Doc. 82-10 at 1.) Staton responded with an opposition letter on August 3, 2020. (Doc. 116-1 at 39–40.) Staton filed a claim with the EEOC and the Montana Human Rights Bureau ("MHRB") in which she alleged discrimination, harassment, and retaliation. (Doc. 116, ¶ 55.) Sheriff Lester terminated Staton's employment on August 24, 2020, twenty days after the EEOC had notified BSB of Staton's claim. (Doc. 82-12 at 1.) Staton filed this action on November 18, 2020. (Doc. 1.)

## LEGAL STANDARD

Summary judgment proves proper if the movant demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in the non-moving party's favor. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 317, 323 (1986). The Court must enter summary judgment if "the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

The movant bears the initial burden of informing the Court of the basis for its motion and "identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it

4

believes demonstrate the absence of a genuine issue of material fact." *Id.* The movant satisfies its burden when the documentary evidence produced by the parties permits only one conclusion. *Anderson*, 477 U.S. at 251–52. Where the moving party has met its initial burden, the party opposing the motion "may not rest upon the mere allegations or denials of his pleading, but [. . .] must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 248 (internal quotation marks omitted).

## DISCUSSION

BSB has moved for summary judgment on each of Staton's remaining claims. The Court will address each claim separately.

### a. Sex/Gender Discrimination under Title VII and MHRA

BSB argues that Staton's gender/sex discrimination claims under Title VII and the MHRA fail because Staton cannot demonstrate that she was qualified for employment with BSB LED. (Doc. 80 at 12.) Title VII "prohibits employer discrimination on the basis of sex regarding 'compensation, terms, conditions, or privileges of employment.'" *Fuller v. Idaho Dep't of Corr.*, 865 F.3d 1154, 1161 (2017) (citing 42 U.S.C. § 2000e-2(a)(1)). Montana law also prohibits discrimination by employers on the basis of sex. *See* Mont. Code Ann. § 49-2-303(1)(a).

The United States Supreme Court has established a burden shifting framework for evaluating Title VII discrimination claims. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). The Montana Supreme Court has adopted this framework for

analyzing discrimination under the MHRA. *Martinez v. Yellowstone County Welfare Dep't*, 626 P.2d 242, 245–46 (Mont. 1981). Under the *McDonell Douglas* framework, the plaintiff must make a prima facie case by demonstrating the following: "(1) [s]he belongs to a protected class; (2) [s]he was qualified for the position; (3) [s]he was subject to an adverse employment action; and (4) similarly situated individuals outside [her] protected class were treated more favorably." *Opara v. Yellen*, 57 F.4th 709, 722 (9th Cir. 2023) (internal citations omitted). The degree of proof needed to establish a prima facie case proves minimal and "'does not even need to rise to the level of a preponderance of the evidence.'" *Id.* (quoting *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1062 (9th Cir. 2002)).

Once the plaintiff establishes a prima facie case, the burden "shift[s] to the employer to articulate some legitimate, nondiscriminatory reason" for the employment action. *McDonell Douglas*, 411 U.S. at 802. The burden then shifts back to the employee to show that the "articulated reason is pretextual." "[V]ery little [] evidence is necessary to raise a genuine issue of fact regarding an employer's motive; any indication of discriminatory motive . . . may suffice to raise a question that can only be resolved by a fact-finder." *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1124 (9th Cir. 2004) (quoting *Schnidrig v. Columbia Mach., Inc.*, 80 F.3d 1406, 1409 (9th Cir. 1996)). A factual question precluding summary judgment "will almost always exist with respect to any claim of a nondiscriminatory reason" when

the evidence "consists of more than the *McDonnell Douglas* presumption." *McGinest*, 360 F.3d at 1124 (quoting *Sischo-Nownejad v. Merced Community College Dist.*, 934 F.2d 1104, 1111 (9th Cir. 1991)).

### i.    Prima Facie Case

BSB argues that Staton's lack of fitness for employment in law enforcement prevents her from establishing a prima facie case. (Doc. 80 at 12.) BSB cites Dr. Watson's evaluation, Staton's admission that she was "barely functioning," Staton's performance issues, and Staton's admission that her psychological scores from Dr. Watson's evaluation reflect a person not fit for duty. (*Id.* at 15–16.) Staton may establish a prima facie case of gender/sex discrimination by meeting the four *McDonnell Douglas* elements or "offer[ing] direct or circumstantial evidence of discriminatory motive." *Opara*, 57 F.4th at 722.

Staton meets the first prong of the *McDonnell Douglas* presumption test because her gender qualifies as a protected class. *See Bostock v. Clayton Cty.*, 140 S. Ct. 1731, 1739 (2020). Staton experienced an adverse employment action. "Adverse employment actions may include any decision by an employer affecting 'compensation, terms, conditions, or privileges of employment.'" *Daugherty v. Deschutes County*, 6:19-cv-00897-MK, 2021 U.S. Dist. LEXIS 124779, at *25 (D. Or. May 6, 2021) (citing 42 U.S.C. § 2000e-2(a)(1)). "[T]his not only covers 'terms' and 'conditions' in the narrow contractual sense, but 'evinces a congressional intent

to strike at the entire spectrum of disparate treatment of men and women in employment.'" *Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 78 (1998) (citing *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986)).

Staton alleges, and an affidavit filed by former BSB LED employee Melissa O'Dell supports her claim, that BSB prohibited female officers from riding in the same patrol vehicle. (Doc. 113, ¶ 6.) Staton further alleges that an affidavit filed by former BSB LED employee Sharmon Hock supports her claim that BSB LED required Staton and Hock—both women—to check in and check out everywhere they went while male counterparts were not required to do so. (Doc. 115, ¶ 6.) Captain George Holland ("Captain Holland") testified that he required Staton to check in and check out when she left the house even if she was off duty on a sick day "per policy." (Doc. 116-2 at 9.) Sergeant Jeff Williams ("Sergeant Williams") testified that no such policy existed. (Doc. 116-3 at 8.) Uncontroverted evidence also exists that BSB placed Staton on administrative leave, required her to undergo an FFDE, and terminated her employment. (Doc. 116 at 28, 36.) These events demonstrate that Staton experienced adverse employment actions.

Staton has presented sufficient evidence for a reasonable juror to conclude that BSB treated similarly situated employees outside Staton's protected class more favorably. The affidavits from Hock and O'Dell cite two specific examples in which BSB treated female officers differently than male officers. Staton also presented

8

evidence that Sergeant Williams and Detective Stearns, both male officers, remained behind on their caseload in 2019 like Staton. (Doc. 116-3 at 9.) These officers continued receiving cases and were not assigned a supervisor with whom they had to work through their cases. BSB argues that these employees do not stand "similarly situated" to Staton because Sergeant Williams ranked above Staton and neither proved to be as far behind or to suffer with as serious performance issues.

Staton also has presented evidence, however, that BSB reprimanded her in two instances in which her male counterparts received no reprimands. One of these instances involved Staton's patrol at a Butte High School football game. It remains disputed whether Staton responded "let it go" to the dean's concern that a student was intoxicated. It appears undisputed, however, that Staton asserted Sergeant Ray Vaughn ("Sergeant Vaughn") would have to handle the issue because he had the portable breath test. (Doc. 116-2 at 16.) BSB reprimanded Staton, the only female officer, for the incident despite Sergeant Vaughn possessing the breathalyzer needed to respond to the incident and being the ranking officer on site. (*Id.*)

The other incident involved Staton reporting that an officer had assaulted a man during an arrest due to the man's sexual orientation. (Doc. 116-2 at 20.) Captain Holland used the name of the victim, the officers involved, and the location reported by Staton to locate a booking photo in which the victim appeared bloody. (*Id.*) Captain Holland verbally admonished Staton for not reporting the incident earlier

9

and documented her non-reporting in his supervisor notes. (*Id.*) Captain Holland never reprimanded or spoke to the male officer who allegedly perpetrated the assault. (*Id.* at 5.) Captain Holland never reprimanded the other male officers present during the alleged assault who also failed to report it. (*Id.*) Construing the evidence in the light most favorable to Staton, two male officers engaged in the same conduct that she did and received no discipline and another male officer committed much more egregious and potentially criminal conduct and received no discipline.

Finally, a genuine issue of material fact exists as to whether Staton proved qualified for employment with the BSB LED at the time of her termination. BSB argues that Staton proved unqualified. BSB cites Dr. Watson's FFDE coupled with Staton's admission that she was "barely functioning." Staton does not argue that her psychological inventory scores from March 2020 reflect someone who is not fit for duty. (Doc. 110 at 15.) Staton contends, however, that the disparate and discriminatory treatment caused Staton to experience trauma which resulted in her exhibiting psychological inventory scores of a person unfit for duty. (*Id.*)

Dr. Watson admitted that a person's psychological inventory scales, specifically in the paranoid category, may be higher if the person is experiencing trauma. (Doc. 116-7 at 16.) Dr. Watson also noted that Staton exhibited an elevated paranoid score. (*Id.*) BSB argues that "whether Staton was 'experiencing trauma' at the time of her FFDE does not create an issue of material fact regarding her lack of

fitness at the time of the FFDE." (Doc. 133 at 10.) This argument ignores Staton's contention that the discrimination she experienced from BSB and its agents caused the trauma. Taking BSB's argument to its logical extension, an employer could always avoid liability for discrimination as long as the discrimination imposes such a severe psychological toll as to render the employee unqualified for employment.

BSB's reliance on Staton's admission that she was "barely functioning" ignores the remaining content of Staton's email. The email explained that Staton was uncomfortable coming to work due to the hostile work environment and that her health had been affected to the point that she was "barely functioning." (Doc. 81-9 at 2.) Staton's seventeen years of success as an officer and her promotion to detective further support her argument that she proved qualified for the job. A genuine issue of material fact exists as to whether Staton proved qualified absent the alleged discrimination. The Court will leave this question to the jury.

Staton also has raised questions about the validity of Dr. Watson's evaluation. Staton produced emails between Dr. Watson and Sheriff Lester and Undersheriff Skuletich that could be interpreted as Dr. Watson accepting input from Staton's superiors on his report. (Doc. 116-7 at 31–33.) The emails produced indicate that Dr. Watson's FFDE of Staton "is quite beyond the extend [sic] of a regular FFDE" and that Dr. Watson expressed concern about legal risk and asked BSB to indemnify legal costs associated with the report. (Doc. 116-7 at 28–29, 32–33.)

11

Staton produced a report from her expert outlining several ways in which Dr. Watson deviated from the typical FFDE administration. (Doc. 116-16.) The Court declines to consider the report at this stage because Staton failed to produce an affidavit or deposition testimony regarding the report. "[F]or an expert opinion to be considered on summary judgment, it must be accompanied by a proper affidavit or deposition testimony; courts in the Ninth Circuit have routinely held that unsworn expert reports are inadmissible." *FNBN-RESCON I LLC v. Ritter*, 2:11-cv-1867-JAD-VCF, 2014 U.S. Dist. LEXIS 130128, at *12–13 (D. Nev. March 12, 2014) (internal quotations omitted). Notwithstanding the exclusion of the report, Staton presented evidence from the deposition of Dr. Watson that raised genuine issues as to his qualifications and methods in performing the FFDE. (Doc. 110 at 16–19.)

Staton disputes whether she proved fit for duty at the time of her termination in August of 2020. (*Id.*) Staton argues that the raw scores from Dr. Patenaude's evaluation reflect someone fit for duty. (Doc. 111, ¶ 5.) The Court again will decline to consider this evidence. The Court may "only consider admissible evidence when reviewing a motion for summary judgment." *Weil v. Citizens Telecom Servs. Co., LLC*, 922 D.3d 993, 998 (9th Cir. 2019) (internal citations omitted). Staton's counsel's declaration that Staton's expert "reviewed the data and informed counsel that the 'raw data' reflected inventory scores within the normal ranges and someone that is fit for duty as a law enforcement officer" falls within the definition of hearsay.

Fed. R. Evid. 801(c). Rule 802 of the Federal Rules of Evidence prohibits the admission of such evidence. The Court declines to consider inadmissible evidence in deciding BSB's motion for summary judgment.

Ignoring the declaration about Dr. Patenaude's raw data and the unsworn expert opinion, Staton has presented evidence that she received less favorable treatment than her male colleagues. Staton presented sworn affidavits of former BSB employees that BSB required female officers to check in and check out and prohibited female officers from riding in the same vehicle. Staton produced testimony that supports her contention that she received discipline on at least two occasions when male officers received no discipline for similar conduct. Looking at the other circumstantial evidence produced, Staton offered testimony that all four women interviewed by Edmunds believed that BSB did not like having women in the LED. (Doc. 116-6 at 5.) Staton also produced photographs of penises drawn on her car, and there exists uncontroverted evidence that someone placed tampons in her mailbox. (Doc. 116-1 at 35–36; Doc. 116-2 at 3.) These events involved sexual and gendered items and targeted Staton as a female officer.

BSB compares this case to *Vasquez v. County of Los Angeles*. 349 F.3d 634 (9th Cir. 2003). In *Vasquez*, a probation officer at a youth detention center alleged discrimination based on national origin. *Id.* at 638. Vasquez presented only two comments made by a co-worker with slight seniority to support his claim. *Id.* at 640.

The co-worker's comments showed animus based on national origin. *See id.* at 638. The Ninth Circuit emphasized, however, that the co-worker lacked involvement in the decision to transfer Vasquez to a new position. *Vasquez*, 349 F.3d at 640. A neutral party made that decision after having investigated a claim that Vasquez disregarded the order of a superior officer. *Id.* The Ninth Circuit highlighted the need for a nexus between the discriminatory conduct and the employment decisions. *Id.*

Staton's case proves distinguishable from *Vasquez* on several grounds. First, Staton's alleged discrimination occurred over a period of years, from 2018 to 2020, with at least one HR investigation and several HR complaints. Second, Staton cites several instances of discrimination ranging from the tampons in her mailbox to the penis drawings on her car to the calendar outside her office. Third, Vasquez could only identify one time where he received different treatment than other officers, and those officers did not stand similarly situated. *Id.* at 641.

Staton presented evidence that she received discipline for not reporting another officer's assault of a gay man. Two male officers who were present and chose not to report the incident received no discipline. Those officers engaged in the same problematic conduct yet received different treatment. Fourth, Staton alleges a nexus between her termination and the discriminatory conduct. Staton contends that the alleged discrimination caused her trauma that led to her exhibiting unfavorable psychological scores. Staton also has alleged that BSB worked with Dr. Watson to

14

produce an FFDE that would justify terminating her as retaliation for her HR complaints. (Doc. 82-11 at 1; Doc. 110 at 16.) Staton presents evidence, addressed more below in the pretext section, that raises a genuine issue of material fact as to whether BSB colluded with Dr. Watson.

"'[T]he requisite degree of proof necessary to establish a prima facie case [under the *McDonnell Douglas* framework] on summary judgment is minimal and does not even need to rise to the level of a preponderance of the evidence.'" *Opara*, 57 F.4th at 722 (quoting *Villiarimo*, 281 F.3d at 1062). Similarly, "'[w]hen a plaintiff . . . seeks to establish a prima facie case through the submission of actual evidence, very little such evidence is necessary.'" *Opara*, 57 F.4th at 723 (quoting *Schnidrig*, 80 F.3d at 1409). The Court finds that Staton has made a prima facie case when viewing the evidence presented by Staton in the light most favorable to her.

### ii.   Legitimate, Non-Discriminatory Reason

BSB has offered a legitimate, non-discriminatory reason for terminating Staton. BSB cites serious mistakes made by Staton in the months preceding her FFDE. BSB notes that Staton threw away evidence at a homicide scene, collected evidence from a scene that warrants did not cover, lost her taser, fell behind on her caseload, and incorrectly stored cases and evidence. Sheriff Lester admitted that these mistakes proved serious and concerning. (Doc. 116-4 at 8.) Sheriff Lester also conceded that he would not have terminated Staton absent Dr. Watson's "not fit for

15

duty" determination. (*Id.*) The findings of the FFDE, despite this contrary evidence, provide a legitimate, non-discriminatory reason for having terminated Staton.

### iii.    Pretext

The burden now shifts to Staton to demonstrate that the non-discriminatory reason proffered by BSB proves pretextual. "To avoid summary judgment, [a plaintiff] 'must do more than establish a prima facie case and deny the credibility of the [defendant's] witnesses.'" *Bradley v. Harcourt, Brace & Co.*, 104 F.3d 267, 270 (9th Cir. 1996) (quoting *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 890 (9th Cir. 1994)). The plaintiff can show pretext either: "(1) 'directly, by showing that unlawful discrimination more likely [than not] motivated the employer;' (2) 'indirectly, by showing that the employer's proffered explanation is 'unworthy of credence' because it is internally inconsistent or otherwise not believable;' or via 'a combination of the[se] two kinds of evidence.'" *Opara*, 57 F.4th at 723 (quoting *Chuang v. Univ. of Cal. Davis, Bd. Of Trs.*, 225 F.3d 1115, 1127 (9th Cir. 2000)). "Where 'abundant and uncontroverted independent evidence' suggests that 'no discrimination . . . occurred,' plaintiff's 'creat[ion of] only a weak issue of fact as to whether the employer's reason was untrue' will not suffice." *Opara*, 57 F.4th at 724 (quoting *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 148 (2000)).

Staton agrees that the psychological scores from the FFDE performed by Dr. Watson show a person unfit for duty. Staton alleges that BSB hired Dr. Watson for

the FFDE because he was "someone who would say what [BSB] needed." (Doc. 110 at 16.) Staton presented testimony from Dr. Watson in which he admitted to conversing with BSB employees, including Captain Holland, Sergeant Williams, and Sheriff Lester throughout the FFDE process. (Doc. 116-7 at 18.) Dr. Watson did so despite Staton's contention that Captain Holland and Sergeant Williams were responsible for the allegedly hostile work environment and discrimination that Staton faced. (Doc. 116-9 at 7.) Dr. Watson testified that he emailed Sheriff Lester and Undersheriff Skuletich multiple drafts of his report. (Doc. 116-7 at 24.)

Dr. Watson also stated in email that Staton's "FFDE is quite beyond [sic] the extend [sic] of a regular FFDE" and "my DRAFT . . . goes above and beyond the parameters of an FFDE." (Doc. 116-7 at 31.) Staton has produced text messages from Dr. Watson to Sheriff Lester and Undersheriff Skuletich in which Dr. Watson writes "[t]here is a need to develop your plan." This information, coupled with Dr. Watson's email to Sheriff Lester expressing concern for legal risk and indemnification, potentially support Staton's theory that BSB worked with Dr. Watson to produce an FFDE that would justify terminating Staton.

The timing of Sheriff Lester's referral for the FFDE also supports Staton's contention. Staton challenged BSB's investigation into her HR claim via email on January 24, 2020. (Doc. 81-9 at 2.) Sheriff Lester received a copy of the email. (Doc. 116-5 at 4.) Sheriff Lester referred Staton for the FFDE less than a month later on

February 19, 2020. (Doc. 81-9 at 4.) "[T]he timing of adverse employment action can provide strong evidence of retaliation." *Stegall v. Citadel Broad. Co.*, 350 F.3d 1061, 1069 (9th Cir. 2003). Likewise, the timing of Sheriff Lester's referral for the FFDE could provide evidence that the FFDE served as pretext to terminate Staton. The Court recognizes that these facts present a close case. The Court also recognizes, however, how the Ninth Circuit has interpreted the burden:

> the plaintiff in an employment discrimination action need produce very little evidence in order to overcome an employer's motion for summary judgment. This is because 'the ultimate question is one that can only be resolved through a searching inquiry - one that is most appropriately conducted by a factfinder, upon a full record.'

*Chuang*, 225 F.3d at 1124 (quoting *Schnidrig*, 80 F.3d at 1410). A genuine issue of material fact exists as to whether BSB discriminated against Staton in the conditions and privileges of her employment based on her sex/gender. The Court will deny BSB's motion for summary judgment on Count I of Staton's Amended Complaint.

### b. Hostile Work Environment under Title VII and MHRA

BSB argues that Staton's hostile work environment claim fails because Staton lacks evidence that BSB subjected her to certain conduct because of her status as a woman. (Doc. 80 at 17.) BSB further argues that BSB's conduct does not prove sufficiently severe or pervasive. (*Id.* at 24.) The statutory prohibition on discrimination in employment "extends to the creation of a hostile work environment that 'is sufficiently severe or pervasive to alter the conditions of the victim's

18

employment.'" *Fuller v. Idaho Dep't of Corr.*, 865 F. 3d 1154, 1162 (9th Cir. 2017) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). A plaintiff must demonstrate three elements to prevail on a hostile work environment claim: "1) [the employee] was subjected to verbal or physical conduct of a sexual nature, 2) this conduct was unwelcome, and 3) this conduct was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Fuller*, 865 F.3d at 1161 (internal quotations omitted). The work environment must prove "both subjectively and objectively hostile; that is, she must show that she perceived her work environment to be hostile, and that a reasonable person in her position would perceive it to be so." *Dominguez-Curry v. Nev. Transp. Dep't*, 424 F.3d 1027, 1034 (9th Cir. 2005) (internal citations omitted).

The Court considers all the circumstances to determine if conduct proves sufficiently severe or pervasive. *Christian v. Umpqua Bank*, 984 F.3d 801, 809 (9th Cir. 2020.) The Court considers "the frequency of the discriminatory conduct; its severity; whether its physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* (internal quotations omitted). The severity of the conduct "'varies inversely with the pervasiveness or frequency of the conduct.'" *Id.* (quoting citing *Nichols v. Azteca Rest. Enters., Inc.*, 256 F.3d 864, 872 (9th Cir. 2001)).

BSB argues that Staton has failed to show that BSB's alleged conduct proves sexual or gendered in nature. (Doc. 80 at 17.) BSB disregards that tampons were placed in Staton's mailbox. BSB also ignores the fact that someone drew penises on Staton's car while it sat in the BSB lot and hung a calendar that displayed a male co-worker with a Glock superimposed on his genitals outside Staton's office. BSB writes off the claim that Sergeant Williams pointed a laser from a training gun at Staton's chest. In doing so, BSB asks the Court to accept Sergeant Williams's and Captain Holland's testimony over that of Staton. BSB asks the Court to do the same with the allegations of the SWAT team "Fuckable list." The Court makes no "credibility determinations with respect to statements made in affidavits, answers to interrogatories, admissions, or depositions" at the summary judgment stage. *Dominguez-Curry*, 424 F.3d at 1036 (internal quotations omitted).

BSB further argues that Staton has failed to show that BSB's conduct proved sufficiently severe or pervasive to create a hostile work environment. BSB likens this case to *Sanchez v. City of Santa Ana*, 936 F.2d 1027 (9th Cir. 1990), and *Kortan v. California Youth Auth.*, 217 F.3d 1104 (9th Cir. 2000). In *Sanchez*, Latino police officers brought claims against the Santa Ana Police Department for a hostile work environment. 936 F.2d at 1030–32. The officers pointed to a racist cartoon posted on the roll call board and alleged that the department was assigning unsafe vehicles to Latino police officers. *Id.* at 1031. The officers further alleged that Latino officers

20

received inadequate backup and had secret personnel files kept on them. *Id.* The Ninth Circuit upheld the district court's grant of a "directed verdict" in favor of the employer on the hostile work environment claim. *Id.*

*Sanchez* proves distinguishable in its procedural posture. The Ninth Circuit in *Sanchez* emphasized that by seeking a directed verdict on an issue upon which the Court served as the factfinder, the defendants effectively had sought a dismissal under Fed. R. Evid. 41(b). *Id.* at 1037. "On a Rule 41(b) motion, the trial judge weighs the evidence, resolves conflicts and determines where the preponderance lies." *Johnson v. United States Postal Service*, 756 F.2d 1461, 1464 (9th Cir. 1985). The procedural posture in *Sanchez* permitted the district court to make credibility determinations and factual findings and to weigh the evidence. The Court may not do so at the summary judgment stage.

The Ninth Circuit in *Kortan* determined that conduct proved insufficiently severe or pervasive to create a hostile work environment. 217 F.3d at 1111. The employee pointed to comments made by her supervisor, including references to a female superintendent as a "castrating bitch," "madonna," or "regina." *Id.* at 1110. The Ninth Circuit acknowledged that the comments were offensive, but emphasized that the conduct occurred on one occasion, and the supervisor never directed any of the comments towards Kortan. *Id.* at 1110–11. The Ninth Circuit concluded that "no

triable issue exists about whether the conduct was frequent, severe or abusive enough to interfere unreasonably with [the plaintiff's] employment." *Id.* at 1111.

Staton alleges conduct more pervasive than in *Kortan*. Staton alleges multiple events occurring across an extended period. The alleged tampon incident occurred in July of 2019 while the penis drawings occurred on or about April 3, 2018, and Sergeant Williams allegedly pointed the training gun and its laser at Staton's breasts in late summer or early fall of 2019. (Doc. 116-1 at 6, 8, 36.). Unlike in *Kortan*, Staton also presented evidence of differing treatment between male and female officers. (Doc. 115, ¶ 6; Doc. 113, ¶ 6.) BSB discounts that any of the alleged events occurred and instead asks the Court to weigh the evidence and evaluate the credibility of witnesses. BSB argues that each event, either viewed by itself or with one or two other events, proves insufficiently pervasive and severe. The Court must view the relevant conduct in its entire context rather than as isolated instances. "[T]he reality is 'that a hostile work environment is ambient and persistent, and that it continues to exist between overt manifestations." *Christian*, 984 F.3d at 810.

The plaintiff in *Davis v. Team Elec. Co.* presented differing access to the job trailer among her and her male co-workers as evidence for her hostile work environment claim. 520 F.3d 1080, 1095–96 (9th Cir. 2008). The plaintiff also presented comments, including "this is a man's working world out here, you know" and "[w]e don't mind if females are working as long as they don't complain" as

additional evidence. *Id.* at 1096. Other evidence included statements from a foreman on the plaintiff's site that the food he brought was only for the guys and that the plaintiff should work for another foreman because he needed a girlfriend. *Id.* The Ninth Circuit recognized that these "incidents fall far short of physical abuse or aggressive sexual advances," but noted that such incidents would have upset a reasonable woman and made work more difficult. *Id.* The Ninth Circuit reasoned that "the conduct was sufficiently hostile to overcome summary judgment." *Id.*

This case also involves no aggressive sexual advances or physical abuse, but it involves alleged disparate treatment between male and female employees. Like the female employee in *Davis* who was prohibited from accessing the office trailer, Staton alleges, and a former female BSB officer corroborates, that BSB prohibited women from riding in patrol vehicles together. This case also resembles *Davis* in the alleged overall sentiment of not wanting women in the workplace. All four of the women that Edmunds interviewed indicated that BSB LED did not want women employees. (Doc. 116-6 at 5.) Finally, the various discrete incidents in the two-year period from 2018 to 2020 including the tampons, the laser pointing, the SWAT list, the penis drawings, the calendar, and the discipline for reporting unauthorized use of force resemble the "conduct occur[ing] repeatedly over the course of Davis's employment." *Id.* "In close cases such as this one, where the severity of frequent abuse is questionable, it is more appropriate to leave the assessment to the fact-finder

than for the court to decide the case on summary judgment." *Id.* The Court will deny BSB's motion for summary judgment on the hostile work environment claim.

### c. Retaliation

BSB contends that Staton's retaliation claim fails because Staton cannot show a causal connection between her protected activity and termination or that BSB's proffered reason for the termination is pretextual. (Doc. 80 at 29–33.) Title VII prohibits employers from discriminating against an employee because the employee "has opposed any practice made an unlawful employment practice by [Title VII], or because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3(a); *see also Stegall*, 350 F.3d at 1065.

A claimant must show the following to make out a prima facie case: "(1) she engaged in a protected activity, (2) she suffered an adverse employment action, and (3) there was a causal link between her activity and the employment decision." *Stegall*, 350 F.3d at 1065–66 (internal quotations omitted). Upon the showing of a prima facie case, the *McDonnell Douglas* framework applies and shifts the burden to the employer to show a "legitimate, non-discriminatory justification for the adverse employment action." *Id.* at 1066 (internal quotations omitted). The burden then shifts back to the plaintiff to show that the proffered reason is pretextual. *Id.*

### i.      Prima Facie Case

BSB does not dispute that Staton filed an internal complaint alleging a hostile work environment and disparate treatment. (Doc. 116, ¶ 27.) The filing of an internal complaint alleging discrimination or a hostile work environment counts as protected activity. *See Villiarimo*, 281 F.3d at 1064. The filing of a charge of discrimination with the EEOC, as Staton did, also counts as protected activity. *Miller v. Fairchild Industries, Inc.*, 797 F.2d 727, 731 (9th Cir. 1986). Staton satisfies the adverse employment action element. "[A]n action is cognizable as an adverse employment action if it is reasonably likely to deter employees from engaging in protected activity." *Ray v. Henderson*, 217 F.3d 1234, 1243 (9th Cir. 2000). BSB placed Staton on administrative leave, required her to undergo an FFDE, and terminated her. (Doc. 116, ¶¶ 44, 60.) These events constitute adverse employment actions.

Staton has presented sufficient evidence for a reasonable juror to conclude that a causal link exists between Staton's protected activity and the adverse employment actions. "[T]he causal link element is construed broadly so that a plaintiff merely has to prove that the protected activity and the negative . . . action are not completely unrelated." *Emeldi v. Univ. of Oregon*, 698 F.3d 715, 726 (9th Cir. 2012) (internal quotations omitted). The Ninth Circuit has recognized that the timing of adverse employment actions can provide strong evidence of retaliation. *Stegall*, 350 F.3d at 1069.

"Temporal proximity between protected activity and an adverse employment action can by itself constitute sufficient circumstantial evidence of retaliation in some cases." *Id.* (internal quotations omitted). The Ninth Circuit has concluded that evidence of a causal link proves sufficient to avoid summary judgment where the employer laid off the employee two months after EEOC settlements concluded. *Miller*, 797 F.2d at 732. The Ninth Circuit has refused to infer causation where eighteen months elapsed between the protected activity and adverse employment action. *Villiarimo*, 281 F.3d at 1065.

Staton filed an HR complaint on October 23, 2019, alleging harassment and a hostile work environment. (Doc. 116, ¶ 27.) Staton contested BSB's investigation of this HR complaint in an email to HR employee, Leslie Clark, on January 24, 2020. (Doc. 81-9 at 2). Leslie Clark forwarded the email to Sheriff Lester. (Doc. 116-5 at 4.) Sheriff Lester placed Staton on leave approximately one month later and required Staton to undergo an FFDE. (Doc. 116, ¶ 44.) Sheriff Lester sent a letter indicating his intent to terminate Staton on July 27, 2023. (Doc. 116-1 at 43.) Staton contested the termination and filed a charge of discrimination with the EEOC on August 3, 2020. (Doc. 81-9 at 5–6.) The EEOC notified Sheriff Lester of a charge of discrimination the next day. (Doc. 116, ¶ 58.) Sheriff Lester terminated Staton's employment approximately 20 days later on August 24, 2020. (*Id.*, ¶ 60.)

The timing of Staton's protected activity and the adverse employment actions support an inference of causation. BSB placed Staton on administrative leave four months after she filed an HR complaint and one month after she challenged BSB's investigation into the complaint. BSB terminated Staton twenty days after Sheriff Lester received notice of the filing of a charge of discrimination with the EEOC.

Staton has presented other circumstances that further support an inference of causation. Staton reported retaliation during the investigation of her HR complaint. (Doc. 116-1 at 19–20.) Staton reported that a fellow officer sang "Let It Go" and then stood in Staton's doorway and said "Let it go. Isn't that right Rhonda?" (Doc. 116-1 at 19.) Sergeant Williams then began yelling "I'm going to take this all the way to the Supreme Court." (*Id.*) Viewing the evidence in the light most favorable to Staton, a reasonable jury could conclude that Staton's protected activity caused her to be placed on administrative leave and terminated. Staton has presented a sufficient prima facie case of retaliation to avoid summary judgment.

### ii.    Legitimate, Non-Discriminatory Reason

BSB has offered a legitimate, non-discriminatory reason for the adverse employment actions. BSB cites the following mistakes made by Staton in the months preceding her FFDE: throwing away evidence at a homicide scene, collecting evidence that warrants did not cover, losing her taser, falling behind on her caseload, and incorrectly storing cases and evidence. These mistakes and the FFDE results

provide a legitimate reason for the adverse employment actions. *See Burroughs v. City of Tucson*, No. CV-16-00724-TUC-BGM, 2018 U.S. Dist. LEXIS 178269, *37–38 (D. Ariz. Oct. 16, 2018).

### iii. Pretext

The burden now shifts to Staton to show that BSB's proffered reason proves pretextual. Staton can show pretext "by 'directly persuading the court that a discriminatory reason more likely motivated the employer[,] or indirectly by showing that the employer's proffered explanation is unworthy of credence.'" *Stegall*, 350 F.3d at 1066 (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981)).

Dr. Watson testified that he emailed multiple drafts of his report to Sheriff Lester and Undersheriff Skuletich. (Doc. 116-7 at 24.) Dr. Watson also stated in email that Staton's "FFDE is quite beyond [sic] the extend [sic] of a regular FFDE" and "my DRAFT . . . goes above and beyond the parameters of an FFDE." (Doc. 116-7 at 31.) Staton further has produced text messages between Dr. Watson and Sheriff Lester and Undersheriff Skuletich in which Dr. Watson writes "[t]here is a need to develop your plan." This material coupled with Dr. Watson's email expressing concern for legal risk and indemnification lends support to Staton's argument that BSB worked with Dr. Watson to produce an FFDE that would justify Staton's termination. Likewise, Sheriff Lester's referral for an FFDE approximately

one month after Staton contested the results of the investigation into her HR complaint supports Staton's claim of a discriminatory motive.

Staton has produced sufficient evidence to create a genuine issue of material fact as to whether BSB retaliated against Staton. The Court must view the temporal proximity between Staton's protected activity and her adverse employment actions, the comments from senior co-workers regarding her HR complaint, and the communications between agents of BSB and the individual responsible for the "not fit for duty" determination in the light most favorable to Staton. A reasonable juror could conclude based on this evidence that BSB retaliated against Staton for reporting discrimination and harassment.

### d. Disability Discrimination under ADA and Montana law

BSB argues that Staton's ADA claim fails because Staton does not qualify as disabled or a qualified individual under the ADA and cannot show that BSB terminated her because of a disability. (Doc. 80 at 34–43.) "The ADA prohibits an employer from 'discriminat[ing] against a qualified individual on the basis of disability.'" *Curley v. City of N. Las Vegas*, 772 F.3d 629, 632 (9th Cir. 2014) (quoting 42 U.S.C. § 12112(a)). The *McDonnell Douglas* burden shifting framework applies to ADA claims. *Id.* The MHRA similarly prohibits discrimination by an employer on the basis of physical or mental disability. *See* Mont. Code Ann. § 49-2-303(1)(a). Montana looks to federal law in interpreting the MHRA because the

29

MHRA closely models the ADA. *Pannoni v. Board of Trustees*, 90 P.3d 438, 444 (Mont. 2004); *Borges v. Missoula Cty. Sheriff's Office*, 415 P.3d 976, 984 (Mont. 2018).

### i.    ADA

A plaintiff seeking to establish a prima facie case under the ADA or MHRA must prove the following: (1) they constitute a disabled person; (2) they prove qualified to perform the essential functions of their job; and (3) they suffered an adverse employment action because of their mental or physical disability. *Conlan v. Costco Wholesale Corp.*, CV 18-94-H-JTJ, 2021 U.S. Dist. LEXIS 108185, at *23 (D. Mont. June 9, 2021). Disability under the ADA means "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1). The ADA further defines major life activities to include "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A).

Staton argues that she suffered from a mental impairment that limited her ability to perform her job. (Doc. 7, ¶¶ 98, 101.) BSB argues that Staton, at most, can point to a PTSD diagnosis. BSB further argues that Staton failed to show that her PTSD "interfered with her ability to perform a broad range of jobs." (Doc. 133 at

25.) The Ninth Circuit clarified in *Weaving v. City of Hillsboro* that plaintiffs no longer need to present evidence about labor markets and an inability to work in a broad range of jobs to qualify as having a disability. 763 F.3d 1106, 1112 (9th Cir. 2014.) Plaintiffs need only show that they are substantially limited compared to most people in the general population. *Id.* (citing 29 C.F.R. § 1630.2(j)(1)(ii)).

BSB cites Staton's ability to perform her job adequately from 2008 until 2018 despite having PTSD as evidence that Staton's PTSD did not substantially limit her. Staton's counselor, Lori Stiffler, testified that Staton suffered from PTSD and that the alleged workplace harassment and discrimination exacerbated Staton's symptoms. (Doc. 116-8 at 5.) The Code of Federal Regulations expressly recognizes PTSD as "substantially limit[ing] brain function." 29 C.F.R. § 1630.2(j)(3)(iii). Staton has presented sufficient evidence that she suffered from a disability.

BSB contends that Staton has not shown that she proved qualified to perform the essential functions of a law enforcement officer. BSB makes the same argument that it made with respect to the sex discrimination claim that Staton's "unfit for duty" designation rendered her unqualified. The Court rejects this argument for the same reasons outlined above. Staton's years of adequate performance and her promotion to detective before entering the environment that she alleges exacerbated her PTSD creates a genuine issue of material fact as to whether Staton proved qualified for employment absent the alleged discrimination.

31

Finally, BSB argues that Staton has presented no evidence that the adverse employment actions occurred because of Staton's PTSD. BSB contends that BSB lacked knowledge of Staton's diagnosis. Staton's email to HR indicated that her health had been affected to the point that she was "barely functioning" and had to seek "counseling." (Doc. 81-9 at 2.) The portions of Sheriff Lester's deposition cited by BSB also show that Sheriff Lester believed "psychological reasons" could be behind Staton's slip in job performance. (Doc. 80 at 43.) BSB attempts to distinguish employment actions taken because of Staton's diagnosis from actions taken because of Staton's performance. "[C]onduct resulting from a disability is considered to be part of the disability, rather than a separate basis for termination." *Mayo v. PCC Structurals, Inc.*, 795 F.3d 941, 946 (9th Cir. 2015) (internal quotations omitted). Whether Staton's PTSD caused the poor performance and FFDE results that formed the basis for BSB terminating Staton presents a genuine issue of material fact. Staton has presented a prima facie case from which a jury could conclude BSB discriminated against her because of a disability.

### ii.    MHRA

BSB argues that Staton's amended complaint alleges a violation of Mont. Code Ann. § 49-4-101. BSB notes that Mont. Code Ann. § 49-4-101 only pertains to discrimination based on physical disability. BSB seeks summary judgment because Staton has presented no evidence of a physical disability. Staton concedes

that she cited the incorrect statute, but argues instead that the complaint sufficiently pleaded the state law claim of discrimination based on mental disability. (Doc. 110 at 37.)

Plaintiffs need not identify a particular statute upon which they base their recovery. *Chen v. D'Amico*, NO. C16-1877JLR, 2017 U.S. Dist. LEXIS 197200, at * 13 (W.D. Wash. Nov. 29, 2017) (citing *McCalden v. Cal. Library Ass'n*, 955 F.2d 1214, 1223 (9th Cir. 1990)) An incorrect statutory citation will not render a claim invalid, but the claimant must provide notice of the actual claim. *See Chen*, 2017 U.S. Dist. LEXIS 197200, at * 13; *Finical v. Collections Unlimited, Inc.*, 65 F. Supp. 2d 1032, 1047–48 (D. Ariz. 1999).

Staton provided sufficient notice of her claim of discrimination based on mental disability in her amended complaint. Staton pleaded violations of Mont. Code Ann. § 49-2-303 elsewhere in her complaint. Staton further placed her MHRA disability discrimination in the same count as her ADA claim. The facts supporting those claims clearly indicate Staton's theory that she "had a mental impairment" and that BSB failed to offer accommodations such as "counseling." (Doc. 7, ¶¶ 96–106.) These allegations put BSB on notice of Staton's theory of discrimination based on mental disability. The Court will construe the MHRA disability claim under Mont. Code Ann. § 49-2-303(1)(a). The Court will deny BSB's Motion for Summary Judgment on this count for the same reasoning outlined above on the ADA claim.

### e. Inflection of Emotional Distress

BSB contends that Staton's IED claim fails because the MHRA provides the sole remedy for discrimination. (Doc. 80 at 45–46.) The MHRA "bars a plaintiff from pursuing other tort claims where those claims arise from underlying allegations of discrimination." *Arthur v. Pierre Ltd.*, 100 P.3d 987, 992 (Mont. 2004). In deciding whether the MHRA bars an action, the Montana Supreme Court "look[s] to the gravamen of the party's complaint, as opposed to the party's characterization of her claims" and "focus[es] on the 'nature of the alleged conduct.'" *Lay v. State Dep't of Military Affairs*, 351 P.3d 672, 675 (Mont. 2015) (quoting *Saucier v. McDonald's Rests. of Mont. Inc.*, 179 P.3d 481, 493–94 (Mont. 2008)).

The Montana Supreme Court determined in *Edwards v. Cascade County Sheriff's Dep't* that the MHRA barred emotional distress claims. 223 P.3d 893, 906 (Mont. 2009). The plaintiffs alleged discrimination based on their political beliefs and intentional or negligent IED. *Id.* at 898, 905. The Montana Supreme Court noted that the plaintiffs had alleged that "their damages, including for severe emotional distress, were 'a direct and proximate result of the discrimination.'" *Id.* at 906. The Montana Supreme Court concluded that the plaintiffs had grounded their emotional distress claims in allegations of politically motivated discrimination. *Id.*

Staton presents her complaint in a vaguer context than the plaintiffs in *Edwards*. Staton alleges that her emotional distress stemmed from BSB's "conduct."

(Doc. 7, ¶ 120.) A review of Staton's complaint reveals, however, that Staton grounds her IED claim on the same allegations that support her discrimination and retaliation claims. Staton argues that her IED claims derive from "BSBLED and Watson's collusion to gaslight Staton." (Doc. 110 at 38.) Staton alleges that Watson and BSBLED colluded to "[give] BSBLED what it thought it needed to terminate Staton without allowing her to participate in the counseling or treatment" and that BSBLED "simply hired someone who would say what it needed." (Doc. 110 at 16, 21.) Staton also alleges that "BSBLED and Watson used Watson's psychological methods to cause her, and others, into questioning Staton's sanity and *experiences of discrimination and harassment*." (Doc. 110 at 38 (emphasis added).)

Staton also cited the following bases for her claim of emotion distress:

1.  Plaintiff was required to check in and out every time she left the BSB, no matter how briefly she was expected to be out, *while similarly situated male employees were not required to do so*.
. . .
5.  Plaintiff received disproportionally fewer call outs than *similarly situated male employees.*
. . .
10. Plaintiff was required to undergo a psychiatric evaluation and subsequently terminated due to the dubious results of her evaluation *while similarly situated male employees were not terminated.*

11. Offensive, including sexually explicit, materials were posted near Plaintiff's office.

12. Plaintiff was held to a stricter standard than similarly situated BSB employees.

35

13. Reports were falsified about improper equipment use *because she was a female.*

. . .

16. Certain Department employees would routinely and intentionally ignore Plaintiff or refuse to acknowledge her presence.

17. Plaintiff's motor vehicle was defaced by certain other Department employees with drawings of male genitalia.

18. Certain Department employees placed tampons and other offensive items *targeting Plaintiff's gender* in her mailbox.

(Doc. 133-2 at 3–4 (emphasis added).) These allegations show that Staton asserts discriminatory and retaliatory conduct to support her claim for IED. The gravamen of Staton's IED claim proves to be discrimination and retaliation. The MHRA accordingly bars the emotional distress claim. *Edwards*, 223 P.3d at 906. The Court will grant BSB's Motion for Summary Judgment on this count.

### f. Punitive Damages

BSB argued and Staton conceded at the hearing that Staton may not recover punitive damages against BSB. Staton's only argument in support of her punitive damages claim posits that she could recover punitive damages from Dr. Watson. Dr. Watson is not a party to this case. The Court has denied Staton's motion for leave to amend her complaint to add Dr. Watson. (Doc. 157 at 8–9.) The Court will grant summary judgment in BSB's favor on the punitive damages claim.

### CONCLUSION

Genuine issues of material fact exist regarding Staton's sex/gender discrimination, hostile work environment, retaliation, and disability discrimination

36

claims. The Court will grant BSB's Motion for Summary Judgment as to Staton's claims for infliction of emotional distress and punitive damages. MHRA bars the infliction of emotional distress claim, and Staton may not recover punitive damages against BSB.

## ORDER

Accordingly, **IT IS ORDERED** that:

1. BSB's Motion for Summary Judgment (Doc. 79) on Count I, Count II, Count III, and Count IV is **DENIED**.

2. BSB's Motion for Summary Judgment (Doc. 79) on Count VI (infliction of emotional distress) and Staton's punitive damages claim is **GRANTED**.

3. Staton's claims for infliction of emotional distress (Count VI) and punitive damages are hereby **DISMISSED** with prejudice.

Dated this 9th day of November, 2023.


Brian Morris, Chief District Judge
United States District Court